Opinion by
Mr. Justice Sutton.
This is a class action concerning the interpretation of the Commercial Fertilizer Act of 1949 as amended in 1959 (C.R.S. ’53, 6-13-3 et seq.) which statute requires the licensing of dealers in commercial fertilizers.
Plaintiffs in error were plaintiffs in the trial court and will be referred to as “Plaintiffs”; defendants in error were defendants and will be referred to as the “Commissioner” or the “State” as appropriate.
The following question of law is the sole point in issue:
*151 “Is ‘manipulated manure,’ as defined by Chapter 6, Article 13, Colorado Revised Statutes, 1953, a ‘commercial fertilizer’ as defined by that statute, so as to render the suppliers of manipulated manures subject to the inspection fees provided for in Chapter 6, Article 13, Section 6, sub-section (1) of that Statute?”
The complaint alleges that plaintiffs are dealers in organic fertilizer materials and are manure manipulators within the terms of the statute since they process animal and vegetable manures by drying and grinding and then selling or distributing their products to the public. They assert that, except for the new five dollar licensing fee required of manipulators by the 1959 amendment, the statute requiring registration of each grade and brand of commercial fertilizer and the payment of a 25c per ton inspection fee thereon, has no application to them. They sought a refund of all fees “illegally and wrongfully extracted”; an injunction; a declaratory judgment declaring the Commissioner’s interpretation of the statute invalid; and requested general relief.
The case being at issue, was tried on stipulated facts which included an agreement that if the findings were for the plaintiffs, “any of said inspection fees paid under protest by any of the plaintiffs,” would be ordered refunded. The judgment was in favor of the Commissioner.
A careful review of the statute as applied to the facts disclosed by the record convinces us that the trial court was in error.
The obvious purpose of the statute as first adopted was that of preventing abuses in the sale of unregulated commercial fertilizers. The Attorney General admitted in oral argument that though the statute is a police measure, as to the products here concerned “no public health, safety, or morals question” is involved. It is important to note that the parties had also expressly stipu *152 lated that plaintiffs do not compound their fertilizers with other materials.
The primary difficulty is that the statute both before and after the 1959. amendment, in 6-13-3 entitled “Definitions” states in pertinent part “(1) The term fertilizer material means any substance containing water-soluble nitrogen, available phosphoric acid, or water-soluble potash used primarily as a plant nutrient and for compounding mixed fertilizer except unmanipulated animal and vegetable manures.” (Emphasis supplied.)
A reading of the balance of the statute, before the 1959 amendment, demonstrates that it was not then the legislative intent to regulate manipulated natural fertilizers when they are only dried and ground and when no chemicals have been added thereto. For example, the title of the act itself relates only to “Commercial Fertilizers” and 6-13-1 states that the article is to be known as “The Commercial Fertilizer Law of 1949”; 6-13-4 concerns the registration of brand names and grades and requires chemical analysis. This relates specifically and only to “commercial fertilizer or soil amendments,” the latter not being of concern in this action. And, 6-13-3 in its many definitions includes one for “commercial fertilizer” stating [in (3)] that it “* * * includes mixed fertilizers only of nitrogen, phosphoric acid and potash quality, either singly or in combination.” “Mixed fertilizers” had prior thereto been defined [in (2)] as follows:
“The term mixed fertilizer means only water-soluble nitrogen, available phosphoric acid or water-soluble potash in a combination of mixture.”
The statute also required labeling of all commercial fertilizers offered for sale or distributed (6-13-5); the sources from which the three named chemicals are derived [6-13-4 (1) (d)]; and that “The plant food content of each and every brand of commercial fertilizer or soil amendment must remain uniform for the (one year) period of registration.” [6-13-4 (3)].
*153 Common sense, as well as the rules of statutory construction, dictate that no farm yard type of fertilizer, which by its very nature is chemically unstable and uncertain in mineral content, was intended to be included in this statute before the 1959 amendment. In addition, it would appear that it is not reasonably practical to determine the chemical content of a ton of natural fertilizer. This is true whether such natural fertilizers are sold by the farmer or rancher in their original state or whether they are first dried, and then ground by him or by a dealer. The general legislative intent, notwithstanding the language of the exception as set forth in 6-13-3 (1), clearly did not contemplate regulation of natural uncompounded manipulated manures. What the statute did intend to cover was a compounding or mixing of chemical ingredients (as distinguished from natural fertilizers) either together or with other substances to create what are generally known as “commercial fertilizers.” The wording and terms used recognize that natural animal and organic fertilizers are not commercial fertilizers as known in the trade or in common usage. By this construction the legislative intent obvious on the face of the statute is carried out.
We turn now to the 1959 amendments and the question of whether they make sufficient changes from the original purpose of the act so as to place plaintiffs under the rigors of 6-13-4 relating to registration, brand names, chemical analysis, chemical source disclosures and uniformity as well as subjecting them to payment of the inspection fees for commercial fertilizers under 6-13-6.
Broadly speaking, and, as pertinent here, the 1959 amendments amended 6-13-3 et seq. as follows:
6-13-3. “Definitions” were enlarged upon to further define “unmanipulated manures” [6-13-3 (6)]. “Manipulated manures” [6-13-3 (7) (a)] as well as a “manipulator” [6-13-3 (8)] are both defined for the first time.
It is subsections (7) (a) and (b), however, that now cause the difficulty, (a) defines “manipulated manures” *154 as we have noted and (b) provides that these manures must guarantee the minimum percentages of “total nitrogen, available phosphoric acid, and soluble or available potash” in multiples of half percentages. As previously stated we are persuaded that before the 1959 amendment the statute could not, nor was it intended, to apply to the products of these plaintiffs. We believe that 7 (a) standing alone is broad enough to include these plaintiffs to require their payment of a license fee. It is evident, however, that the application of (b) is limited to commercial fertilizers.
The judgment is reversed and the cause remanded to the trial court with directions to determine the amounts of inspection fees, if any, paid by plaintiffs under protest, and to order a refund thereof with statutory interest and cost.
Mr. Justice McWilliams and Mr. Justice Pringle concur.